Elizabeth L. Hughes, Plaintiff, *v*. Sarah E. Techt, Defendant.

(Supreme Court, New York Trial Term, March, 1919.)

Aliens — who not to be deemed an alien — definition of the term "alien enemy "— treaties — decedents' estates —" Trading with the Enemy Act," § 2 — U. S. Revised Statutes, § 4068 — Real Property Law, § 10, as amended in 1913.

During the war between the United States and Austro-Hungary a resident of the state of New York, survived by two daughters, died intestate, seized of certain real property in this state. In an action by one of the daughters to bar her sister, whose husband is an Austrian subject, of all claims to an estate in said land, *held:*

1. The defendant was not to be deemed an alien by any rule of the law of nations as now universally recognized and admitted.

2. If not an alien enemy by reason of the state of belligerency between the respective nationals at the situs of the land and the person on whom descent is cast, defendant is an "alien friend " under section 10 of the Real Property Law as amended in 1913 and entitled to inherit.

3. Even if an "alien enemy " within the definition of that term as defined in the "Trading with the Enemy Act," the provisions of the treaty of 1850 between Austria and America protect defendant's right of inheritance for two years from the date of descent, unless such treaty be abrogated by the declaration of war *ex proprio vigore.*

4. Said treaty was not abrogated by the declaration of war because :

(a) The modern rule of international law does not recognize the annulment of a treaty's provisions having to do with immovables and their ownership immediately upon a state of war.

(b) Even if it does, section 4068 of the United States Revised Statutes preserves the rights of an alien enemy for such time as any provision of a treaty gives him or her to dispose of his or her effects and depart from the country, if his or her deportation be ordered.

Action to bar all claims to an estate in the lands of a father, which would, except for alienage, descend to a daughter.

Lee & Wadsworth, for plaintiff.

Bernhard H. Levy (Samuel Franklin, of counsel), for defendant.

McAvoy, J.   This controversy presents in its subject matter a question of both academic and pragmatic interest, arising out of the possible difference in citizenship of heirs to real property in this state.   The form of the cause is that of an action to bar all claim to an estate in the lands of her father, which would, except for alienage, descend to the defendant daughter.   The New York law is set forth in section 10 of the Real Property Law, which, as amended in 1913, reads:  " Section 10. Capacity to hold real property. 1. A citizen of the United States is capable of holding real property within this state, and of taking the same by descent, devise or purchase.   2. Alien friends are empowered to take, hold, transmit and dispose of real property within this state in the same manner as native-born citizens, and their heirs and devisees take in the same manner as citizens; provided, however, that nothing herein contained shall affect the rights of this state in any action or proceeding for escheat instituted before May nineteen, eighteen hundred and ninety-seven."   The defendant Techt is the wife of an Austrian subject and is, of course, politically a subject of Austria herself, taking, as our federal statute prescribes, the national status of her husband. 34 United States Statutes at Large, chapter 2534, section 3, adopted March 2, 1907, enacts "Any American woman who marries a foreigner shall take the nationality of her husband.   At the termination of the marital relation she may resume her American citizenship, if abroad, by registering as an American citizen within one year with a consul of the United

States, or by returning to reside in the United States, or, if residing in the United States at the termination of the marital relation, by continuing to reside therein.'' This rule arises from the common-law principle of identity of husband and wife, which has ground in the domestic policy of the state as well as the international policy of the nation. While much of relaxation in the rigidity of this ancient principle of juridical fiction has been effected in the enactment of the various Married Women's Disabilities Acts, yet it is still deemed of public concern to retain it and to merge the identity of the espoused and give dominance to the husband. The woman married to a foreigner by her voluntary act of marriage performs an act of expatriation as voluntary and distinct as would be a formal declaration of intent by her to assume the nationality of her husband, if such be required by the laws of the alien nation. Any different rule of determining a married woman's citizenship would doubtless bring the nation into embarrassments and controversies in times of peace and *a fortiori* in such times as a state of belligerency exists between the respective states. Whatever the legislative policy may be it is, when enacted, a paramount direction to courts to enforce its terms, and expedient questions or individual instances of hardships are outside of the judicial cognizance. When the president proclaimed a state of war existed between these United States and the Imperial and Royal Austro-Hungarian government on December 7, 1917, which public act the court will judicially notice, the defendant's husband was an alien subject of that government, and, as is shown in the foregoing reasoning, the defendant, his wife, was a subject of the same political sovereignty. On December 27, 1917, the intestate defendant's father, through whom title must be derived, died resident here, leav-

ing as survivors two daughters, plaintiff and defendant. These parties are then the sole heirs presumptively to any real property of which seisin was in him at the time of his death. Can the defendant Techt inherit realty under our New York law, as quoted above, in view of her national status as an Austrian subject while war still pends between this nation and that into whose sovereignty expatriation by marriage has consigned her? The answer depends upon the construction of the term " alien friends " as used in the New York statute. Because if she be, although an alien with whose country we are at war, nevertheless, an " alien friend " as the law of nations defines her status or in the absence of such fixation by the concepts of international law, there is room for the holding under our public law that she is such " alien friend," she may not be barred from right of descent from her parent. But even though the common construction of the term " alien friend " be followed as one who is subject of a friendly power, yet the right of inheritance may be secured to her by capitulations of our Treaty of Commerce and Navigation made with the Austrian empire in May, 1848, and subsequently ratified and proclaimed in February, 1850, unless the *jus gentium* is explicit in universal rule that an act of war is sufficient to abrogate all treaties in equal force with a specific denouncement of them, or at least suspends their operation during belligerency with a requirement for special revival of the capitulatory terms in the treaty of peace or protocols consequent upon and determining the state of war. As to the initial proposal that is outlined, to wit, that an alien may be an alien friend, even though the land of his sovereignty is embroiled in war with the government under which he actually is domiciled; the publicists and writers on this sub-

ject are to be divided into the classes of thought represented as strict and ancient or liberal and modern. The strict doctrine is favorable toward holding all aliens born in the enemy country or aliens who become subjects of such country by expatriation as *ipso nationalitate* of alien enemy status. This is, too, the common belief, and the term is loosely employed in various public documents, such as proclamations, messages, statutes, ordinances, departmental regulations and matters *ejusdem generis*. The modernists in public law, however, do not hold alien nationality of a person of the enemy belligerent country as conferring or imposing the status of enemy alien. The fact of residence during the time of war is the pivot upon which this decision turns. It may be that an alien born in enemy country is nevertheless an alien friend. *Per contra,* a native born in our own country resident in the enemy country becomes and remains during such foreign domicile in the status of enemy alien. Vattel's Law of Nations, lib. 3, ch. 5, § 77, and see p. 477; 2 Montesquieu, 12; Chitty's Law of Nations, 67. To similar effect is the dictum of Puffendorf, in his Del Jure Naturae et Gentium, B. 8, ch. 6, § 21. As to the rigorous rule, support is found in Grotius' De Jure Belli et Pacis, lib. 3, ch. 6, § 2, and Bynkershoek, in chapters 3 and 4 of *Quaestiones Juris Publici,* reviews the general scope of his observations of the customs and usages of nations in respect of the persons and property of enemy subjects, and concludes that practically all their rights may be completely extinguished. It is the better view and the wiser doctrine to hold with the modernists that our public law will look upon alien subjects of a power in a state of belligerency against us as alien friends while domiciled here until and unless public order and security, as proclaimed by the executive

clothed with the power of administering war, declares such denizens of enemy character. In our legislative policy during this war such an intent is manifest. The term "enemy" under the Trading With the Enemy Act is defined: "Section 2 (a). Any individual, partnership or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory. (b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent or agency thereof. (c) Such other individuals, or body or class of individuals, as may be natives, citizens or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term 'enemy.'" The class under which defendant might fall is that recited in subdivision (c), but her exclusion from that category is confirmed by stipulation of the parties. "Fifteenth. That none of the persons (includes defendant) mentioned in paragraph fourteenth of this stipulation have been interned, nor has the loyalty of any of them to the United States been questioned by the federal, state, city, town or village, or other competent authority, tribunal or official thereof, and all of them have been peaceable residents of the United

34

States.'' In no proclamation of the president in respect to Austrian denizens or residents has there been any declaration that such residents or denizens of this country of belligerent nationality are alien enemies. Alien friends are under our statute of descent of realty as it is hereinabove quoted, entitled to be treated in reference to civil rights as if they were native-born American citizens and have all the enjoyment of personal rights of a citizen of the republic. The rule pronounced in Hall's International Law (6th ed. 338) governs the modern instances of alienage in a country belligerent with one's land of nationality. It reads: '' When persons are allowed to remain, either for a specified time after the commencement of war or during good behavior, they are exonerated from the disabilities of enemies for such time as they in fact stay, and they are placed in the same position as other foreigners, except that they cannot carry on a direct trade in their own or other enemy vessels with the enemy country.'' The conclusion seems irrefragable that the defendant's status is that of '' alien friend,'' and that she is of course outside the category of alien enemy. However, if this reasoning be upon any ground faulty, the defendant is entitled to inherit under our treaty with the Austrian empire as mentioned above, unless, as most ancient and some modern jurisconsults and publicists declare, a state of war dissolves all treaties between the belligerent parties. As to the latter problem there is not unanimity of opinion. Mr. Moore in his digest says that on this subject there is '' much contrariety of views, but,'' he continues, '' it may be affirmed that the proposition that all treaties are extinguished or annulled by war is unsupported by authority at the present day.'' Fiore says that '' as to treaties between belligerents it cannot be admitted that a state

of war extinguishes them all, but only such as are incompatible with that state.'' Pillet declares that '' the view that a declaration of war annuls treaties between belligerents is no longer held by anyone.'' In our war with Spain in 1898, that power expressly denounced its treaties of October, 1795, and January, 1877, '' and all other agreements, compacts and conventions that have been in force up to the present between the two countries.'' Proclamations and Decrees during War with Spain, Department of State Documents. This act of a sovereign nation in modern times clearly indicates a view that otherwise treaties or their capitulatory grants would otherwise continue in force *ex proprio vigore* even though a state of war had been formally pronounced and promulgated. The very nature of some of the provisions of treaties of commerce inhibits their abrogation by the mere outbreak of war between the high contracting parties. It will be observed in the content of many of the stipulations that their continuance is either expressly or impliedly forecast for at least a reasonable period after the state of belligerency has inception. Vattel says that the revocation or denouncement of a treaty after the outbreak of war requires a public act of which the judicial courts, executive and legislative assemblies must take notice. Law of Nations, book 2, chap. 2, p. 145. Of such is the clause of the treaty in question here. It provides: Article II. '' Where, on the death of any person holding real property or property not personal, within the territories of one party, such real property would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizens or subjects shall be allowed a term of two years to sell the same, which term may be reasonably prolonged,

according to circumstances, and to withdraw the proceeds thereof, without molestation, and exempt from any other charges than those which may be imposed in like cases upon the inhabitants of the country from which such proceeds may be withdrawn." Article III. "In case of the absence of the heirs, the same care shall be taken, provisionally, of such real or personal property as would be taken in a like case of property belonging to the natives of the country, until the lawful owner or the person who has a right to sell the same, according to Article II, may take measures to receive or dispose of the inheritance." These provisions of the treaty clearly remove from the defendant daughter of the intestate the disqualification, if such exist, of her alienage. The intent of these stipulations is to confer the power to take and hold lands. An authority to sell lands and appropriate the proceeds of the sale is equivalent to grant of ownership. No one can sell lands which he is incapable of taking and holding. By virtue, therefore, of this treaty between the United States and Austria the defendant takes title to the land subject only to the obligation imposed by the treaty to sell and dispose of the same within two years or within such prolonged time as may be accorded her. This effect of the treaty is accomplished through the provision of our Federal Constitution, article 6: "All treaties made or which shall be made under the authority of the United States shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Thus *pro hac vice* it supersedes all local statutes that contravene its provisions and puts the alien person, whatever the effect of the state statute is otherwise in respect to the rights therein secured to him, precisely upon the same footing as

citizens of the state in which the question arises. It is an imperative holding that the fee vests in the defendant, even if held to be outside the common interpretation of the term " alien friend." The right of inheritance so acquired by the defendant pursuant to treaty provision survived the declaration of war between the United States and Austria by reason, too, of the provisions of section 4068 of the United States Revised Statutes: " Section 4068. Time for removal. When an alien who becomes liable as an enemy in the manner prescribed in the preceding section is not chargeable with actual hostility or other crime against public safety he shall be allowed, for the recovery, disposal and removal of his goods and effects and for his departure, the full time which is or shall be stipulated by any treaty then in force between the United States and the hostile nation or government of which he is a native citizen, denizen or subject; and where no such treaty exists or is in force the president may ascertain and declare such reasonable time as may be consistent with the public safety and according to the dictates of humanity and national hospitality." This therefore follows, as demonstrated by or corollary to the above course of argument and conclusion: 1. That Sarah E. Techt is not deemed an alien by reason of any rule of the law of nations as now universally recognized and admitted. 2. That if not an alien enemy by reason of a state of belligerency between the respective nationals of the situs of the land and the person on whom descent is cast, she is an alien friend under the law of the state and entitled to inherit. 3. That even if an alien enemy within the definition of that term under public law, the provisions of the treaty of 1850 between Austria and America protect her right of inheritance for two years from the date of descent, unless such treaty be abro-

gated by the declaration of war *ex proprio vigore.* 4. That the treaty aforesaid is not abrogated by the declaration of war because: (a) The modern rule of international law does not recognize the annulment of a treaty's provisions having to do with immovables (*les immeubles*) and their ownership immediately upon a state of war. Vattel, *supra.* (b) That if it does, the federal statute (U. S. R. S. § 4068) quoted above preserves the rights of an alien enemy for such time as any provision of a treaty gives him to dispose of his effects and depart from the country if such deportation be ordered by the executive. Accordingly the claim of defendant to a descent cast of her father's seisin is good and will not be barred.

Judgment accordingly.